We move to the last case, Mr. Burgess v. Goldstein. Mr. Davis. May it please the courts. Good morning once again. Together with Michael Redman, we represent Detective Retired Gerald Goldstein. As the court is aware, this appeal arises out of the district court's denial of Detective Goldstein's renewed Rule 50 motion for judgment and Rule 59 motion for a new trial. Detective Goldstein's interest in this appeal is informed not simply by the lack of evidence under Rule 50 to support the verdict, but importantly, by the overwhelming opposition in the weight of the evidence to the jury's erroneous application of Rule 807, the rules of evidence, together with the district court's inexplicable decision to permit the jury to rest its verdict on a theory that the district court had itself dispatched from the case a mere three and a half weeks before the trial began. Well, the verdict form in this case was a general verdict. And so we don't really have any way to determine upon what theory they found liability. Is that correct? That is correct, Judge Floyd. And that redounds to the benefit of Detective Goldstein. Because in Detective Goldstein's submission, there are at least two bases on which the district court grievously erred in permitting the jury to return a verdict. And therefore, because of the verdict sheet and the general verdict, the court cannot know on what basis the verdict was returned. Well, does a charge by the judge, and I can't remember if it was made in this case, that what the lawyers say to you is not evidence? And if he gave that to you, how do you plan yourself? Not in this instance. But the charge that we focus on is the little man charge. So just to fill this out, one of the grounds for the Brady claim in this case was that Detective Goldstein had, in bad faith, withheld exculpatory information from the prosecution. One of those items, which the plaintiffs made very much a part of their closing argument, very much a part of their opening statement, was that, quote unquote, little man did it. Now, let me say right up front, this case, this trial was never supposed to be about who killed Michelle Dyson. That was not supposed to be the issue in this case. The issue in this case was, of course, did Detective Goldstein acting in bad faith, willfully withhold from the prosecutor exculpatory information, which was not available to the defense? And that's the classic Brady claim. Now, they have also this so-called fabrication claim, which is knew that the six-year-old was a precipient witness of the events leading up to his mother's execution style murder. And then they duplicate that claim by saying, oh, and by the way, Detective Goldstein created police reports, which said the child was asleep. Well, that's the same claim. All right. So, so Judge, we don't know how the jury decided this case. But what we do know for certain, is that there were two, at least two bases for the jury to decide this case, which arose explicitly, directly, and again, inexplicably, from the district court's erroneous admission of evidence and refusal to instruct. Now, counsel, could you, um, you could finish that. No, Judge, I'm happy to. Um, on the 807 issue, I'm not going to ask you why you believe it was an improper utilization of 807. I've read the briefs and understand that. I'd like for you to respond to the claim that it was a harmless error. What's the Mr. Goldstein's position, or Officer Goldstein's position on that? Thank you, Judge. If you'll indulge me just a little bit, I'm going to give you a more full, I'm going to give you a more fulsome answer to your question. Um, nobody disputes, I don't think, earnestly, that the admission of these documents was error under 807. And by the way, they're in the, in the appendix at 1778 and 1779. I'm going to hold them up right here. And I'm confident that the court can see from the bench just how heavily redacted this triple hearsay exhibit, plaintiff's Exhibit 121 and Exhibit 122, which were included in, uh, 250 plus pages of documents that the plaintiff was able to get from the FBI. So Judge Qualbaum, plaintiffs argue, first of all, that the documents were admissible as business records. Not true. Uh, the triple hearsay contained in these, whatever you say about the pages, sure, they came from the FBI, but whatever you say about that, the triple hearsay in these documents, the information clearly is hearsay. And by the way, when you look at the documents, please understand that these codes of the redactions, they're not identifying people. You know, P1, B, P prime, those are codes under the Freedom of Information Act, the Privacy Act, which tell you why the FBI didn't disclose the information under those blackouts. So they say it's business records. Clearly, it's not business records. If it was business records, the district judge would never have gone to 807 on its own. Number two, the plaintiffs contend that it's not hearsay. Well, of course it's hearsay, Your Honor. Um, and if you don't believe it's hearsay, look at how plaintiffs used it in closing argument. Plaintiff said, we're going to give you six exculpatory pieces of, six pieces of exculpatory information. And what was number one? I'd like to quote it, but I won't. My friend said, those FBI documents. So he argued forcefully before the jury, went on for several pages of the, of the, of the transcript, making clear that the FBI documents were in fact, substantive evidence of exculpatory information that was withheld. And is that part, I mean, I know, um, you're talking right now about whether it's hearsay and I'm trying to get at the harmless error. Cause I tend to think the hearsay argument is compelling, but I, that seems to me the close, the use in closing argument and in the, I think five or six witnesses in the opening argument, it seemed like it was used pretty extensively. If you could, if you could help me understand about that for the record on the harmless error. It was judge and the, the, the, the, the prejudice is inherent in the documents themselves, first of all. Um, and I need to explain the basis for plaintiff's use of them. Again, the, the prosecution of Mr. Burgess in the summer of 1995 for this murder was treated as a domestic violence situation. Um, in fact, it almost certainly was drug related. Okay. And that's what these documents suggest. I'll prove it, but suggest the documents make the prejudice palpable because it enabled it enabled two things in particular, it enabled plaintiff to believe that Mr. Burgess is none of the three people that the FBI thought was involved in this murder, which as a matter of logic is not true. If you look at the document, it says, um, redacted, another black guy and a woman were involved in this murder. There is no showing whatsoever that Mr. Burgess is not the redacted name or that he's not the other black guy who was involved in the murder. Here's another piece that almost missed notice. Judge Paul Obama. If you look at plaintiff's exhibit 121, um, and I don't want to read to the court, but this is important. This one, the FBI, is it this, this, again, the FBI, the FBI document. I think this is the one that 1778, 121. The last paragraph there says this information was furnished to detective redacted detective redacted of the BPD homicide unit with a phone number. That phone number is not the homicide unit at the Baltimore City Police Department was not detective Goldstein's number. Detective redacted is the case detective, and he advised that the information appeared to be accurate and the district court made a determination that it communicated to the jury in any number of different ways, which the plaintiff fully exploited that where it says detective blank redacted is the case detective. Everybody in the courtroom was led to believe that that was detective Goldstein, but the is no showing whatsoever here. But didn't Mr Goldstein's attorney argue that to the jury? As a factual matter? Yes, but shouldn't have had to judge Thacker because these documents should never have been admitted. They're not business records. They're prejudicial, and that's less piece there amounts to an admission by a party opponent, and the district judge treated it that way. Now, nobody used that language, but in fact, that's what it became in front of the jury. Before you run out of time, I want to get back to the jury instruction issue, because I think that's close one for me, and I feel like it's a bit of an ambush, ambushing your client in closing argument. But I can't tell. I don't think the full closing argument is in the record, is it? It's not in the appendix, but it's in the trial record. Right, but it's not in the joint appendix. Okay, it's not in the joint appendix. Can you tell me how in closing argument that was used against your client to your disadvantage? I absolutely can, Judge Thacker. Counsel stood up in his opening close, and he said, I'm going to show you six items of exculpatory evidence. Six. He actually used six, and as I've mentioned to Judge Qualabom, the first was those FBI documents, and he went on and on and on for pages talking about the powerful impact. He actually said one or two pages in, I can sit down now. I don't need to get to items two, three, and four. The little man evidence that the district court had excluded from the case in summary judgment was number four, Judge Thacker, and I actually think I can tell you, maybe I can't, what page number four showed up on. Again, it's in the trial record, but he Yes, thank you. So we have this little man did it evidence, which said to the jury, well, little man, who, by the way, was a well known killer in the neighborhood. He was referred to a trial. He was dead at the time of trial. Of course, he'd been murdered. He was known as a serial killer, as a hit man in the drug trade in the neighborhood, and killed a lot of people, and our friends on the other side made a big deal out of that. And what the judge said in summary judgment, clear as day, there is no basis on which to conclude that Detective Goldstein withheld any evidence about little man. Remember, on the night of the murder, Mr. Burgess was questioned by Detective Goldstein and actually asked him during interrogation, do you know a man named little man? And Mr. Burgess said, well, yeah, I know a man named little man. He said, do you deal drugs with little man? And Mr. Burgess said, well, I'm trying to figure out which little man you're talking about. Mr. Burgess knew the game. Mr. Burgess had been released from prison, a six year prison term in February of 94, eight months or so before Michelle Dyson was killed. Mr. Burgess knew full well the criminal justice game. And you can see that, for example, in the way that he played Detective Goldstein in that interrogation, when he kept saying, give me a lie detector test. I'll take a lie detector test. Well, he knows full well Baltimore City Police are not prepared to give anybody a lie detector test. His criminal defense lawyer, six months later at trial, didn't ask for a that Mr. Burgess would have failed that lie detector test, had he taken it. Because today, 20 years later, his alibi becomes, oh, I was doing a $1,200 drug deal at 25th and Greenmount, when the evidence in the case shows that one of those people mentioned in the FBI documents that never should have been admitted into evidence, dealt drugs at 27th and Greenmount. Did counsel object to the mention of little man in the closing? He did not, Judge Thacker. And the reason is pretty clear. Judge Bennett could not have been more emphatic. We, in this district, he said to counsel, counsel will confirm this, although counsel did break the rule and object at a couple of closing argument in this district. But you can approach the bench, not you, but counsel could approach the bench afterward and object, lodge an objection? Well, could have, but Judge Thacker, he had ruled it out of the case. I know, that's why it would be even, I think I would be jumping up, objecting, might trip somebody. To Judge Thacker's point that he moved in Lemney on that. He had rulings, he just didn't do it contemporaneously at the closing statement because it had been ruled on by the trial judge, not once, but twice, as I recall from the record. That's exactly right. The instruction, our friends on the other side say the instruction was an incorrect statement of the law. And of course, they rely on the principle that, you know, generally it's a deferential standard of review. We understand that. But the point is, the request was appropriate, was an accurate statement of the law. Ladies and gentlemen of the jury, you may not consider in your verdict any evidence relating to whether little man evidence was withheld by Detective Goldstein. We don't know, Judge Floyd and your honors, whether the jury ruled in fact, we think the jury ruled on sympathy and conjecture because of the logical gaps in the case. But with respect to the Rule 59 new trial motion, you can't tell how prejudicial, just how prejudicial the FBI documents were. You can't tell just how prejudicial the little man evidence was. One thing you can tell for sure is the weakness of the six year old witness evidence. Now, how do we know that? Because in opening statement, in contrast to the closing argument, in the opening statement, counsel stood up and went on again for the man who came along 17 years later and said, Oh, I was awake. I was awake. And I saw the men who came in the house and I heard a gunshot and I went back to sleep. That evidence comes along 17 years after the murder in the form of Brian Rainey, who was then serving a prison sentence of his own, now that he's an adult. That was played up as the feature of the case in opening statement. That this new witness, this child witness, who's now 24 years old, is going to come in and testify. As I've said, by closing argument, because Brian Rainey turned out not to be such a great witness in front of the jury and our friends in their briefs say, well, he did the best he could trying to fill in the gaps with a six year old, you know, a 17 year old memory of what happened to him when he was six years old. Wholly incoherent, frankly, and unbelievable. By closing argument, now the feature of the case becomes the FBI documents and little man. He did talk about Brian Rainey, but he abandoned the Brian Rainey as the central feature of the case because after he saw what happened in the trial, he was going in a different direction. Unless there are any further questions, I'll... Thank you. You have some time. Thank you. Mr. Goldstein. Go ahead, Mr. Goldstein. May it please the court, on behalf of myself and Ms. Horn, we represent the plaintiff. And I had intended to start with their primary argument that there wasn't sufficient evidence to support this verdict. And I see they've sort of moved away from that, not surprisingly. You know, that's a very hard hill to climb. And here the evidence was powerful, if not overwhelming, in favor of the plaintiff. Judge Bennett had no difficulty at all in concluding that. And, you know, that's why we have jury trials. They made every argument they made in the brief to the jury, the jury rejected them. There was very strong evidence that Brian Rainey contemporaneously said he was a witness. He contemporaneously said he heard people being spoken, taken in the basement. That's the Lehman note that was withheld by Goldstein. He came to court later and said, I told the police that, they weren't trying to hear it. The jury credited that. Mr. Goldstein concedes that's a Brady violation. He doesn't dispute that that had to be constitutionally turned over. He said I didn't receive it. The jury disagreed with him. So why is the Lehman note exculpatory? I understand it's evidence that Brian may have been awake. And I understand the argument that he might should have done more to investigate that. I don't think, that constitutes either exculpatory evidence or a Brady violation. So the face of the Lehman note, how is that because your honor, Mr. Burgess was told through the police report that Brian wasn't a witness. He slept through it. That's what Mr. Goldstein's report said. If in fact the note had been turned over, the information had been turned over, that Brian in fact witnessed the killers and knew that they weren't his mother's boyfriend, which in fact is what Brian acknowledged when he was later asked about it. Now, Mr. Burgess didn't get to talk to Brian. Mr. Brian's, Brian's grandmother took him away from the case, said, I don't, I've already lost my daughter. I'm not going to lose my grandson. She was concerned that her son had seen the killer. So Mr. Burgess, there's no dispute. She, the son, grandson was gone and not available to him. By misleading the prosecution and the defense and saying that Brian wasn't a witness, he slept through it, they concealed exculpatory information because when Brian was asked years later, he said, I did see it and it wasn't my mother's boyfriend. So your position on its exculpatory nature is the fact that it showed he was awake, not that it identified Burgess or not. Correct. It says that what the note literally says is child Brian witness two men in the basement. And then of course you don't even need to get there because Brian says, I told the police that. I told the police it wasn't Burgess. That's exculpatory. Goldstein admits that you got to turn that over. So that's the end of that. But I do want to talk about the jury instruction because there is a lot of confusion here about what the district court supposedly barred and didn't bar. And you're probably saying to yourself, why is it that if this was so troubling that Judge Bennett wasn't troubled at all? Because Judge Bennett did not rule this was out of the case. There was no objections. Where do we find that? That he did not rule that this was the case. He denied their post trial motion, which is basically a rehash of the arguments they're making on appeal. And that's what he laid out. And let me explain a little bit where that comes from. All Judge Bennett said on summary judgment was you cannot make a Brady claim out of withholding Howard Rice's names. Two paragraphs of summary judgment order. That's all he said. Don't come up to court and say you withheld Howard Rice's name from me because you already had Howard Rice's name. Now, there was no confusion on that at trial because we stipulated we stipulated that Howard Rice was a name that Tabak had. From there, they want to go incredibly broad and suggest that the district court said there will be no claim in this case having anything to never said that. That's not what the summary judgment order said. And that's why all this evidence came in at trial. That's why it came in during opening without objection. That's why it came in through every single witness without objection. And that's why it came in at closing without objection, because that's not what the district court barred. This is revisionism on appeal. The district court barred one thing. He said, don't try to get up there and say that they withheld Howard Rice's name. You knew Howard Rice's name. Well, that's not the same thing as saying under no circumstances can you state a Brady claim that in any way relates to Howard Rice. It's just completely different things. We're not saying we pulled a fast one by them not objecting your honors. We're saying the reason they didn't object is because it wasn't objectionable. But from reading the district court's order, it doesn't say that this is limited to a Brady violation for saying Howard Rice's name. I'm reading it. It talks about Howard Rice being the real perpetrator and a lot of information. It does a lot more than what you just said as I read the record. But we didn't argue anything that was prohibited. We didn't argue anything that was prohibited. It was stipulated at trial that Howard Rice... Well, you argued that Howard Rice was one of the potential people who committed the murder. And your honor, as the instruction says that they had proposed, it says you're allowed to consider this stuff for other things such as example as whether defendant acted in bad faith. The judge didn't bar any of this from the trial. I understand that. But you argued in closing that there was exculpatory evidence about an alternative murderer. And you used Rice and Little Man in your closing. And as I read the order, I'm having trouble connecting what you're saying the judge said with the black and white language of what he said. First of all, Rice and Little Man are two different people. Rice's nickname was Little Howard. And as they argued throughout the trial, that's not Little Man. The instruction that they say that should have been given was information related to Howard Rice shouldn't be an independent exculpatory claim. So, you know, you talked about how was your client prejudiced. They weren't prejudiced. The jury, and your honor, this is really the key. The jury was properly instructed on what makes a Brady claim. It had to have been withheld. It had to be exculpatory. And it couldn't be otherwise ascertainable through reasonable diligence. And the case law is very strong that if a properly instructed jury finds, you know, if the jury is properly instructed, then you don't have to also tell the jury what is not evidence. Well, that's, I mean, we have case law in this circuit that says something different than that, doesn't it? I mean, the U.S. v. Lewis in 1995 Fourth Circuit, actually, that was the argument. That they gave a general instruction on what's a conspiracy. And the defendant asked for an instruction that you couldn't have a conspiracy with a government informant. In other words, limiting what sort of information that provides. The exact same argument you're making. And this court said the opposite of that. All right, then, your honors, then what I want to turn your attention to is the instruction they proffered. Because it is also true, in addition to the fact that there's the Spell case, the case we cited, that if a jury is properly instructed and they find the elements, then that's enough. But what they didn't do was proffer an accurate instruction. And that beats them independently. Because even if he's right about everything he said and you totally agree with him, it was on them to give the district court an instruction that cured the problem. Because as they said, they didn't object during closing argument. By the way, that should be a waiver. You know, I objected during closing argument. They could have objected during closing argument. You can't sit back in closing argument, not object, and then come to appellate court and say, well, I decided I didn't want to look rude. You know, I objected. But the real problem is that the instruction that they proffered was incoherent. In their brief, they try to make it sound like they just tried to give an instruction that the little man evidence is out. That's not what they proffered. They proffered, by the way, on the day of the time the instructions are supposed to have been submitted, they proffered an instruction that says you can consider this evidence, but you can't find a defendant liable based solely on the following six things. And it was in the conjunction. So all the instructions, so the error that they want you to reverse on is refusing an instruction. It can't be an error if the instruction itself is incoherent. The instruction says you can't have a claim based solely on six things, five of which are the Handy, the juvenile arrest, Charles Dorsey, and as I said, they're in the conjunctive. So when I say it's incoherent, that means this instruction literally would have prohibited the jury from finding in favor of plaintiff if they found it solely on these six things, one of which was the Howard Rice evidence. Nobody, you know, that's like a non-scenario. So in other words, if they thought the Brian Rainey evidence had merit and they thought, boy, maybe that Howard Rice stuff had merit after all, this instruction wouldn't have helped them. It wouldn't have helped them. I'm sorry. Yeah. I don't mean to cut you but there's a lot of issues on this appeal and y'all have limited time. So could you, do you concede that notice under 807 was not properly given? No, we don't, your honor. What authority do you, can you give us that says you don't have to give the name of the declarant? Well, I cited in our brief the Weinstein and Berger treatise and, you know, we're arguing whether the district court abused its discretion. If it is literally foreign book law as follows, if the declarant's name and address are unknown, despite reasonable efforts to locate the information, it is enough to give all the information the proponent has been able to acquire by diligent inquiry. But didn't you argue in your brief that the defendant could have obtained the information of the declarant? And if you argued that, couldn't you have too? That was actually their argument. I'm sorry to cut you off. Yeah. Maybe I'm, I'm sorry to tell you if I got that wrong. Well, we, we picked up on it. They argued first in the post-trial motion, you could have gotten it. So we say, well, if it was so easy, then you would have gotten it, but it wasn't so easy. It would have been a futile gesture. We took every diligent step you could. We sent a two weeks request to the FBI. We made requests for the documents. We didn't want them in redacted form. The FBI invoked the law, the Privacy Act, and they redacted these names. We took the steps we could take and they, and, and the, and the, this is what the FBI gave us. The district court said, I find this competent evidence at summary judgment, no later than summary judgment that everybody knew that the district court was, was satisfied that the exercise exception was satisfied. And, uh, the whole purpose of the notice requirement, Your Honor, and I think this is clear from our briefs, is no ambush. You don't want a trial. You don't want evidence to come in that the had noticed that the district court viewed this as competent evidence and viewed these hearsay exception as having been satisfied. And they had an opportunity to meet that evidence. The point that you were alluding to was, well, they could have tried to file a Privacy Act if they, if they, you know, that's what the Berdalles case held is, Hey, it was equally available to you too. But I think the real point here is it was futile for both sides. Everybody did what we could to get the FBI to give us this information. This is what the FBI gave us. But I want to address the hearsay point too, because I was troubled by your question that you thought that the memos were hearsay. And I will, I will wait for the opportunity to clarify. The district court said that the information on the, on the memo is about, you know, there was a, it was about a blown package. There's other witnesses. There was a fight, uh, threats that preceded it. All that's exculpatory. But the district court said, and this is page 37 of our briefs, I am not admitting this evidence for the truth of the matter. It's not hearsay. So to say that these memos are hearsay misses the point that the judge said to them, it's not hearsay. I'm not saying it's true, not true. I'm saying it was the only thing that comes in at trial for which he invoked the 807 exception is the bottom paragraph where he says in the memo, it says that the information was furnished on such and such a date at such and such a time was furnished to the BPD case agent. And that is what had the indice of reliability. So that's the rest of it is not hearsay. It wasn't offered for the truth and there, and there, and there was no objection, et cetera, et cetera. So the only issue is did the district court abuse its discretion by invoking the residual hearsay exception? And it wouldn't, we're not even asking whether the district court error, we're asking whether there was such an abuse of discretion that it could, it could reverse the whole trial. And as the Rivers case and our brief said, you know, we are particularly, the courts are particularly hesitant to disturb district court's hearsay determinations. You'd have to be left with a very firm conviction that something went wrong. And here the indicia of reliability were present. The indicia of reliability, this was a subpoena. It was a, it was a two-way regulation. The FBI produced it. They were produced it with FBI insignias and stamps. The person who created it did it on personal knowledge. He had no incentive to lie. It was produced pursuant to a job or occupation at which it is their duty to create these things. So all the indicia of trustworthiness were present. Furthermore, Goldstein's notes tracked the information precisely. So that's an important point. You know, it says the, the statement that the judge admitted on the residual hearsay exception said it was trans, only that it was transmitted to the, to the Buffalo, I'm sorry, the Baltimore police detective responsible for the case and that he confirmed that it was accurate and that it led to leads on the case. It tracked Goldstein's notes. He denied he had it, but this document suggested otherwise. Now I want to get to the point your prejudice, and I guess you made it in the other context, but Goldstein said, I, when he got stuck in the corner, we're like, boy, it sure looks like you had this FBI information and you admit you withheld it. And you admit, he said, I never turned it over anything like that to the prosecutor. Nobody knew anything like this at all until many years later. And he says, He didn't say he admitted he withheld it. He said he, he, he said he didn't have it and therefore did not. I spoke too carelessly. He can't withhold it, he would say if you don't get it in the first place. I spoke too carelessly. He's not claiming he turned it over. So if a jury could have inferred that he knew it, he loses. It's that simple because, you know, he admitted, boy, that would have been unconstitutional to turn over something this blockbuster. So the question is, did he have it? Did he not have it? This document permitted an inference that he did because the district court made a discretionary hearsay determination that that last paragraph satisfied reliability, but there was an independent reason why the error is harmless if there was an error. Because he says he developed it independently. He says, when I got him sure looks like this, your stuff, your notes, track it, you know, your notes. And so it's not just notes. It's one note that lists five names, the precise witnesses on the FBI documents. So it's one page stripped of the exculpatory information with the name of the barber, the name of the babysitter addresses, you know, hair dimensions, Sinclair lanes. Boy, Mr. Burt, Mr. Goldstein sure looks like the FBI was talking about you when they talk about the Baltimore case detective. He said, no, I developed that information independently. If he developed that, those witnesses independently to get out of the trap, then it doesn't matter that the FBI memos came in because he developed it and he withheld it. The only thing that got, might've gotten turned over is a note with names on it, but without any of the information. So, you know, it's, it's, he got caught on the stand saying, I developed it independently to get out of the FBI thing, but it makes it harmless. If it looked like when I reviewed the record, um, when you, and that there was in the opening and with, I wrote them down, I think one, two, three, four, five, six witnesses that, um, that the FBI document was, um, utilized as well as in closing. If it's not harmless, why did you use the FBI documents? I mean, every, in all those times you were using the FBI memo, not his other admission that he got it from other sources or his other testimony. I don't know if my question is making sense. I think it is. It looks like you were focused in your, you know, um, in your questioning of witnesses and your opening and closing on the FBI documents is central to your case. First of all, let's, let's be clear. Cause there was a number of FBI documents at trial. Maybe that's the confusion and all of them were admitted by agreement there except for these two. So there was a ton of FBI documents that there was no objection to, no present objection to. In fact, it was part of a pretrial agreement where consideration was given. Uh, we settled out some of the defendants pretrial, and this is in the record before, uh, opening statement. And part of the consideration was there's not gonna be any arguments about FBI documents. It's all the FBI document that talked about Howard Rice actually did it, that he confessed to his girlfriend that came in by agreement. So when there was discussion of FBI documents, there was no hearsay objection that was in by agreement. As to the document we're talking about now, this one, you know, we had a two week trial, 3500 pages of transcript. There's one evidentiary objection they're complaining about because they didn't lose any battles. The only reason they're complaining about this one is because the only thing they can find to talk about. It doesn't mean it was terribly significant. It doesn't mean that it was wrong. It just means that's the only error they can even argue about. But when we, Your Honor, to answer your question now more directly, yes, we talked about these memos with other witnesses. At no point did we say, isn't it true, truth of the matter, you know, this stuff. That just wasn't part of the argument. They don't cite it and I'm here representing to you. Nobody said, you know, isn't it true that there was two murderers, one was a black and one was a female. Only context that these memos were talked about was with the police officer, why didn't you investigate this information? Did you have it? Did you not have it? So they're not saying it shouldn't have been part of the trial. It obviously should have been part of the trial. Nobody was arguing the truth of the matter. Well, I'll tell you why, Your Honor. We didn't need this as the truth of the matter. Because we didn't have to prove Burtis didn't do it because there was another FBI memo, as I said, admitted by agreement that said Howard Rice confessed to the crime and he told his girlfriend, he killed that girl at 2703 Barclay and the boyfriend got blamed for it. So we didn't need this to prove that he did it. We weren't using it for a hearsay purpose. The only thing that came up for a trial over and over was, isn't it true you had it, Goldstein, and he kept denying it. But I saw Judge Thacker in particular said that she was troubled by it. The reason there were no objections throughout the trial to the Howard Rice evidence, because it wasn't objectionable. All the district courts said, you can go back and look at the summary judgment order. He said narrowly, you knew about Howard Rice, you knew about the little man note, so you can't make a Brady claim based on that. And then there was a stipulation at trial that said he knew about it. And then the jury was Brady, it's got to be something that was not known about. So what they're arguing now, that what came up in closing argument was that the little man evidence, that if we talked about little man, that could be an independent reason for the verdict. The instruction that they proposed wouldn't have cured that. It wouldn't have cured it. They didn't object to it, so they lose on that ground. And so the only appeal argument they could make is the judge, boy, we should remand it so they give this It doesn't say anything about little man. It doesn't say the things that you quoted from the brief shouldn't be part of the trial. This is what the instruction they asked for was. So you can't reverse a jury verdict on a hypothetical that, you know, well, you don't know, you weren't there. Was that part of the trial? I'm telling you it was part of the trial by agreement. I'm telling you it was part of the trial. There were no objections that it was part of the trial, not part of the trial. They're telling you it wasn't. Only thing they can tell you is, where's the error? The error is they say for failing to give this jury instruction, this jury instruction wouldn't have cured anything. It's incoherent, and it doesn't even relate to the appeal arguments they're making. So there was no error. The district court did not make an evidentiary issue with the hearsay. And on the jury instructions, you have, by everybody's agreement, a properly instructed jury. So the fact that they didn't also give this guidepost instruction doesn't change anything. Thank you. Mr. Davis. The district court created an FBI exception to Rule 807, and it was wrong, and it was prejudicial. The Brian Rainey note mentioned in the layman note must be read together with the exhibit in the sealed appendix. Brian Rainey said to his grandmother, it's right there, in connection with obtaining therapeutic treatment for Brian Rainey when he was seven years old, I saw mom's girlfriend, boyfriend, push her into the basement. Now, that's a paraphrase, but it's right there. Brian Rainey did, in fact, see something, and what he saw was Sabine Burgess. Now, the fact of the matter is the plaintiff did a great job. Look, my hat's off to them. They really did a fantastic job in this case. The fact of the matter is one of the ways they did a great job was by confusing the whole Howard Rice, little Howard, little man stuff. No witness at trial ever identified anybody, anybody connected with this case as little man. Everybody understood that little man was just a variation on Howard Rice's nickname, which was little Howard. He was a little guy. So they did a great job of throwing it all against the wall and making the jury think somebody else killed Michelle Dyson. Even the FBI documents, again, aren't about the Michelle Dyson murder. Again, ITAR drug-related murders. You'll notice these documents aren't sequential. We have no idea what is the source of this information in these documents. Almost certainly, it's scuttlebutt in the neighborhood. That's how Detective Goldstein came upon it. You will notice that the informant, as the district judge said, every informant to the FBI is a confidential informant. If this confidential informant had testified under a disclosed identity at any trial in this circuit, the district judge would have instructed the jury that the testimony of a confidential informant must be scrutinized with care. It's a standard instruction. We have no idea where this information came from. Trustworthiness, they say Michelle Dyson in this document, FBI document, the district judge created an FBI exception to 807, was committed in September of 1994. Now, maybe that's just a typo, a busy agent or transcriber getting it wrong. Sure, errors are made. But this was powerful evidence. This was the FBI saying, we talked to the case detective. Which case detective? Again, the documents themselves say the information was reported to two separate detectives. Neither one of which is the phone number for the homicide unit at the Baltimore City Police Department. It was the whole case squad. So Detective Goldstein was denied a fair trial. I'm with you, Judge Quattlebaum. How on earth does the layman note become exculpatory? It's not exculpatory. When you read the mention of Brian Rainey, together with that note in that therapeutic note that he saw Sabine Burgess rushing his mother into the basement, that's what you have. And so finally, ladies, members of the jury, that was a Freudian slip. Your Honor, that was a good closing. The evidence is insufficient. Detective Goldstein was prejudiced by the jury's ruling, by the judge's rulings. We appreciate your consideration. Have the clerk adjourn court and we'll come down and read counsel. The Honorable Court stands adjourned until tomorrow morning. God save the Honorable Court.
judges: Henry F. Floyd, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.